If it pleases the court, Jack Sleeth, appearing on behalf of Solana Beach School district. I have been amply curious. This whole dispute is about council fees, I assume. Nobody in their right economic mind would be carrying a case to the Ninth Circuit. That seems to me to involve something like $6,000 to $7,000. I don't think so, Your Honor. I think this is really about the importance of the special education requirements for this particular student. The district felt strongly that she needed... No, I understand that. But, I mean, what's really at stake here, in terms of the lawsuit itself, is whether you should reimburse somewhere between $6,000 and $7,000. And for this amount of money, you've gone through a hearing before a hearing officer, a proceeding in the district court, and now you're appealing to the Ninth Circuit. And it seems to me that... And I don't blame you, necessarily. I just want to be clear that this whole dispute is really about council fees, isn't it? No. No? This whole dispute is about what education is appropriate for a preschool student who is exhibiting symptoms of autistic syndrome, when the experts for the school district identify a need for specific education to address those particular problems, and the parents would prefer to have the student... Let me try this again. As far as I can tell, there really is nothing in this lawsuit that is prospective. It all goes back to events that are now several years in the past. Is that correct? True. Okay. The district is hoping that we can get some guidance on what we do with the particular problem where the only way that the district can see to provide an education to the student is a split program. And in this case, they devised what we thought was an elegant solution to the problem with some time in the morning in a special day class that addressed those specific autistic problems that the little girl was still exhibiting, and then put her into a regular education preschool that will have her with ordinary developing students. Now, we briefed all of that out. I don't want to reiterate all of the things in the brief. That was laid out there. What I don't think was clearly brought out in the briefing from either side is the importance of the preparation for preschool students for kindergarten. That is a statutory obligation imposed on this district. Now, we briefed out the testimony of all the experts who were talking about the fact that we need these particular specific educational efforts to go to the preparation of education for kindergarten, but we didn't talk about the underlying statutory obligation. Education Code Section 56411.1 obligates school districts to provide an educational plan that's developed for a preschool student to direct them toward success in kindergarten. And it is mightily important that we have some guidance on how we do this The problem is you can't get the specific education to them that they need in the regular education classroom, but you have an obligation in the law that they be educated in the least restrictive environment. And this hearing officer and the trial court leaped over the need for the special education provision, the special education plan, and moved directly to the test for least restrictive environment. And when you use that test and look at whether the student will progress satisfactorily in the least restrictive environment, the word was satisfactorily, and I don't know who gets to decide that satisfaction. But that's what the school district needs guidance on is should we just simply give up and give the parents the private school education that they want because they want it, even though we believe that it won't provide the education that the psychologist and the outside expert think that we need to provide for the student. The argument was not that there should not have been a special education compartment. In fact, the school that they wanted to send their child to that was providing general education, the problem, as I understand it, that was found by the IJ, I guess it's what it's called, or the Minister of Law Judge, was that this particular general educational component was really not good for the child because of its size, because of the number of children were changed during the course of the two-hour program. Perhaps if you were just given the special education program for four hours of the kind that you gave where there were typical students and autistic children, and one of the experts testified that he couldn't even tell the difference when he looked at the class, that might have sufficed. Maybe not for the IJ, but perhaps in terms of your position here. Well, that might have been an adequate education, but the hearing officer also found that that plan was too restrictive. Well, he may have been wrong, but with respect to that, precisely because it wasn't just a class composed of autistic children. But the problem here seems to be that the general ed component was just simply too big for the child. Well, that's part of the evidence that the hearing officer focused upon, but we're trying to get this student ready for kindergarten, and we need to get her to a regular education kindergarten that is going to be large too. So how are we going to actually effectively do that and address her unique needs with the functioning problems related to her autism and still get her ready for that kindergarten class, and we thought breaking it into two pieces. And the ALJ finds as to each piece that you made a mistake. Yes. As to the first piece, the SDC I guess it's called, the ALJ says it's not the least restrictive because there's evidence that nobody seemed to be disputing that she was thriving in the private school where she was placed, which was not, in which she was, what's the, this terminology is kind of hard for me, full participation or whatever it is. CDC or regular education class. So she was thriving in the small regular education class. And then for the afternoon proposal that you had, number one, it was too big on its own. Apparently you put on some evidence that it was going to be about 24 kids. The ALJ says it looks like it's going to be closer to 30. And then the ALJ says, and for a child, and part of her autism is difficulty of social interaction, she will, during the course of the day, interact with not just the kids in the afternoon. She'll have, of course, interacted with the children in the morning, giving her something like 42 people with whom she has to interact in two discontinuous periods. So the ALJ just abides on the facts with respect to the two things proposed, first the morning SDC class and then the afternoon regular class. Both of them are wrong. And when you put them together, they're even wronger. Well, she actually spent some time saying that they were too good. If you look at... I didn't get the part where she said it was too good. Paragraph 74, which is on page 5721. She says, The inquiry is not whether the SDC is the best for the student. Rather, the inquiry is whether the student should be removed from the general... from is left out... the general education environment because the nature and severity of her disabilities is such that her educational regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. Therefore, even if it's not the best academic setting for the student, a general education classroom is appropriate if the student can receive satisfactory education. She's saying we were offering too much. Too much in the sense of too many kids in the afternoon. I didn't get the sense of too much in the sense of it's too good. If her conclusion had been, this is even better than this child is entitled to under the law, you would have won in front of her. No, because her ultimate ruling was that that was not the least restrictive environment. She used the least restrictive environment component on the special day class, and she used the failure to meet the unique needs component on the regular education class, and we think they needed to be combined and addressed holistically so that you get that special education services that you need to deal with those particular... The expert from... Dr. Schreiberman from San Diego... University of San Diego testified that she was showing perseveration. That is the tendency to return back to a particular subject or interest and not move away and deal with other students. That had to be dealt with, and it's very difficult to deal with that in a regular education classroom, but we have the obligation to get her ready for kindergarten, which is going to be a regular education classroom, so putting them together is why I called it elegant. I think it is a beautiful solution that meets her specific unique needs, which the law obligates us to do, meets our preparation for kindergarten, which the California law obligates us to do, and gets her ready to go into a kindergarten classroom by putting her with a large number of students. Didn't that same expert testify that the truly elegant solution would be to put her in the special ed program in the public school and the general... for the other half of the general ed component at the school she was attending, or was it Fenichel School? Is that the name of it? Hannah Fenichel, I think it stands for. Yeah, isn't that what... I don't recall that she specifically said that that would be an elegant solution. I think that she said that she was progressing well at Hannah Fenichel. I think that... that doesn't take into account the fact that she identified specific symptoms of autistic spectrum problems that that child was having that weren't being addressed in any other way in what ultimately happened to her. I see if it was just an issue of general ed versus special ed that we would have to defer, or the court would have to defer, and even the IJ would have to defer, presumably to the board's decision as to which experts to credit, assuming there was a reasonable basis for it. But ultimately, it seems to me, this goes down, at least in the ALJ's view, because of the nature of the general ed component. And I think that's because she didn't tie those two things together, and that's really what the district needs guidance here on, because we have a lot of cases like this, and this is the kind of thing we need guidance on. Should we provide those additional services that we think the child requires to meet the unique needs, which is half of the law, that got lost in this? I think she did tie it together in that footnote in which she says, when I put them together, I see that she's going to be required to interact with 42 children, and that is in itself a problem. Now, I resist a little bit the approach here, which is you're asking us to say, in the abstract, this is pretty good, but we all know these cases. They're heartbreaking, difficult cases. They're difficult from the side of the parents. They're difficult from the side of the school district. I mean, these are difficult cases. But one of the reasons they're difficult is that each child is different, and what will suit the child within the framework of the law is often very different. So it's hard for us to respond in a way that you want us to respond to say, in the abstract, well, this was just fine, because it's always going to be in the particular. Well, I think there's a great deal of truth in that. Each of these cases is unique, and each one of them is heartbreaking. But when you have – did you notice, in reading through the hearing officer's decision, the hearing officer in the 40s, around paragraph 41 and 42, extolling the independence and the unbiased nature of the psychologist, whose name is Sharon Loveman, she is a friend of the family. She is retired. She's not carrying any brief on behalf of the school district. She's trying to do the very best thing as a senior psychologist for this little girl who needs specific education on specific issues related to special education that can only be delivered effectively in a special education classroom. She testifies to that, and that is concurred in by Dr. Laura Schreiberman, who is an outside expert. And the hearing officer apparently loved their testimony on issues related to bias and skill and capability, but when she gets over to the end of the paragraphs, she says there's an absence of evidence that she couldn't function successfully in the least restrictive environment. And that statement, that there's an absence of evidence, is clearly wrong. I mean, Dr. Schreiberman and psychologist Loveman both said she needed these specific instances of training. She needs this specific help now. We need to get her ready for kindergarten. And to say that there's an absence of evidence when two senior people say she really needs this is to ignore the evidence. And that's what I think happened. I think hearing officers... You're at the end of your time. Let's hear from the other side, but we will give you a chance to respond. Thank you. Thank you, Your Honors. Maureen Graves for K.A. Doyle versus Solana Beach. I would like to start by saying that this, unlike many of the cases that you see and that I see, is actually an exhilarating case. It's not a heartbreaking case. It's about a little girl who at age two was not making eye contact, was not speaking, seemed closed into her own world, noncompliant, somewhat affectionate with her family, but looking severely cognitively impaired and severely autistic. Less than a year later or after less than a year of early intervention, her language scores were mostly or had risen greatly. Her IQ had risen greatly, and Solana Beach wanted to put her in a special day class composed entirely at that point of other children with disabilities with some other kids visiting. She instead... Some other kids visiting. What do you mean? That was the special day class when she was three that were rotating children. The one we settled out. Right. The one we settled. Right. She went under the settlement agreement to have financial preschool. Her IQ rose to the above average range. Her language scores rose primarily into the average range. She had play dates outside of school. She was doing extremely well. Her parents thought that the district would probably offer the child development center. However, instead, after hearing from Dr. Schreibman, the district decided to offer this cobbled together program containing not two but three parts. The ALJ did not count extra peers in the third part of the day because it was listed as one-to-one on the IEP. However, one of the advantages of taking it to school was that the school behaviorist said we can incorporate other children. So 42 plus whoever she might meet the last two hours of her day in the so-called one-to-one program. So this is a child who is doing extremely well, but her situation was very fragile. One of the district's main concerns was that she talked a lot at home but much less at school. The parents thought that putting her from a six-hour-a-week school program into a 17-and-a-half-hour-a-week school program, I think the class size was increasing a little bit, that that was a good transition to get her ready for kindergarten. The kindergarten was raised a great deal at this hearing. There was a lot of evidence on that. And the evidence showed that Hannah Fenichel was an excellent environment to prepare a K.A. for kindergarten. She already had very strong pre-academic skills, what was expected for her age. That was not an area of concern. The district observers never saw the four-year-old classroom at Hannah Fenichel. So when they talked about the nice qualities of a more structured environment, they were comparing that not to the four-year-old classroom at Hannah Fenichel but to the three-year-old classroom, which they had seen, which was indeed a play-based classroom because that's what developmentally appropriate practice for three-year-olds is, that they play and they talk and they don't do a lot of pre-academics in typical preschools. So the district – Dr. Schreibman never testified that K.A. needed a special day class. She testified that she needed more prompting when asked whether that could be done by staff in a general education program. I thought she thought there was too much prompting that was going on. That was – I mean, I could be confused. That was Jody Reese, the district behaviorist. She thought there was too much prompting. And Sharon Loveman thought it would be nice for K.A. to be in the district SDC because she would be more independent in a class with a two-to-one ratio and adults telling children what to do throughout the day, which I'd like to talk about a bit in a moment. But one of – basically, it appeared that district team members were engaged in what I called in the briefs below defensive improvisation. Some of them thought she needed more prompting. Some of them thought she needed less prompting. But Dr. Schreibman's point was that the behaviorist who she saw with K.A. in the three-year-old classroom had not been correcting her behaviors enough. So K.A. was doing a little gazing off. She also had an eye problem. She was blind in one eye for a time. And part of her IEP was that she was to get visual rest. But Dr. Schreibman interpreted that as spacing off behavior, which should have been corrected. She thought that she played with dinosaurs too much, which turned out to be, I believe, 15 minutes out of a two-hour observation. So that was the perseveration. Dr. Schreibman thought she should be allowed back into general education only if her rates of repetitive play were equal to that of non-disabled students, which the ALJ correctly concluded is not the test. She didn't have to stop having autism in order to be fully included in general education. Ms. Loveman also had not seen the four-year-old program, did not testify that K.A. needed a special day class, but she thought the district's program was less restrictive because it was public. She had the same misconception, which I believe the district has shown throughout its briefing in this matter, not realizing that the issue was exposure to non-disabled peers. The record seems to reflect if this child had been able to stay in a private school, it would have, from one's perspective at least, been an ideal situation. The cost, I think, had something to do with it, and the fact that somebody felt she needed socialization, she needed to be exposed to the larger classroom so that she could be prepared to enter kindergarten. Now, where are we so far as you're concerned? Okay. Well, as for class size, her class at Hannah Fenichel had 14 students. It was not a tiny class. It was the same size as her SDC would have been in the district had she gone to it. It was the class size which the district had told Dr. Shrydman the CDC was, telling her that what she had seen was a flukish amalgamation of two classes. In fact, that class size was more like 22 to 24, but this was not a tiny class. It was a class that was designed to prepare children for kindergarten. In fact, the only people who had very concrete evidence about kindergarten expectations in Solana Beach were K.A.'s mother, who had had a child go through kindergarten in the district, and the director of the Hannah Fenichel preschool, who had done a getting ready for kindergarten night and talked about specifically what do you want kids to know when they come to this kindergarten. They had had longer circle times at Hannah Fenichel than at either of the district programs in order to prepare people for the expectations at the specific home kindergarten that everyone expected K.A. to be going to. So on the class size issue, she was moving up. She was moving towards academic structure. She would be with different classes, would be together on the playground. The kind of schedule and number of children she would be exposed to is something that you wouldn't see, according to testimony at hearing, until fourth grade at the earliest in the district. So in your view, what should be this court's position? I think that this court should affirm the decisions as to the appropriateness and least restrictive environment. Those were heavily factual decisions. How would this child respond to transitions? How would this child be affected by larger numbers of children in her day? I think those are questions as to which this court should defer to the district court absent a finding of clear error, and I think there's no basis at all for such a finding. And, in fact, all of the quotations which the district comes up with to try to cast any doubt on the decision turn out to amount to much less than they would appear to upon closer examinations. I don't know, but I think the district was concerned with the cost, wasn't it? Oh, yes, I'm sorry, Judge Press, yes. They may well have been. However, at hearing, since that is one of the allowable factors under the Rachel Holland decision, I did ask the special education director whether cost had been a factor, and she indicated that they don't talk money, that it had not been a factor. At no point has the district put on any evidence about cost. The only time that cost has come up is in the sort of atmospherics. What if everybody wanted this service? What would that cost us? I mean, I agree that the district had various things it could have done. I don't agree that putting her in a very unusual class designed for children with autism with a small minority of typical peers would have satisfied LRE rights. I think the judge was right about that. The plan for that classroom is at the supplemental excerpts of record, pages 868 to 76, and it's not simply that it has a lot of children with disabilities. It's that it's an extremely rigidly organized class that's extremely dissimilar from what you would expect students of that age to be getting from any general education. I don't understand. I thought at least one of the experts said that he looked in on a class and he couldn't tell the difference between typical students and developmentally disabled students. It seems to me that the special ed component, you could say that the Fenershell School was really giving her special ed. Special ed is simply a label designed to describe the nature of class size, individual attention, what techniques are used to try and teach the child. If there were a conflict in expert testimony over the special ed component, wouldn't deference be due to the expert testimony of the board? Well, I think the judge would need to weigh the testimony on both sides. I don't think that there is a basis for deferring to experts because they're called by the school district. No, but doesn't the school district have some discretion in what expert testimony it refers to? Well, yes. There's a conflict in expert testimony, and the school's expert, as I understand it, was an outside expert. It's true they paid her, but she was from some university in the area and had expertise in the area. Right. Well, Dr. Schreibman did testify that she could not be sure which children in the class had disabilities. I mean, there are two ways of looking at that. One is that the children with disabilities were very, actually three ways. One is the children with disabilities had very mild disabilities and would have been fine peer models. That was not consistent with the much more detailed evidence provided by Dr. Bailey, having viewed some of those children as well. Another possible explanation would be that the activities were so rigidly controlled that you couldn't really see children initiating or not initiating social interaction because, as was the design in that class, the children were told who to play with. The activities were very adult-controlled, much more so than in a kindergarten setting. And then the third possibility is that some of the children who were identified as typical peers in that class turned out not to be typical peers. That was something that had happened, it seemed like, at least with one child a year, that parents might choose that class because they wanted to be kind to children with disabilities or they might choose it because they had some developmental concerns, don't want their child labeled, but think it might be nice to have a class with a special education teacher and a lot of support. There's no question that the Fenershel School was the best place, let's assume based on the progress that the child had made while she was there. But does the Board have to offer the best in order to meet its obligations to provide a free and appropriate public education? Certainly not, Your Honor, and I think that the family's expectation, which they testified about at hearing, was that given how well she had done at Hanna Fenershel, probably the district would offer full inclusion at the Child Development Center. That was a program that the district had available. The parents had some concerns about class size, and they would have preferred that she stay with her friends. Wasn't the general ed component going to be in that same, what is it, CDC? That's right, but KA would not be a full participant in that program. That's a five-day-a-week program, and there are children who stay all day for daycare. There are other children who stay for the school section. KA would be there only for about 20 minutes a day of full group activity, and then she would be in some small group time there. So she would be knowing about 30 students in that program, along with about 13 students in the SDC, actually. Yeah. And then there would be some other students in the one-to-one program. So, yes, she would be mainstreamed into that class, but she would not be a part of that class. She would not have the kind of chance to get to know those students that she would have had had she actually been allowed to come to that class Monday through Friday like the other students. There's to say that other class, the second class, the larger class. Right, the CDC. That had its own independent existence, and she would be there for part of the time that that class was meeting. Right. Yes. Yeah. I think slightly less than half of it for most of the kids and way less than half. I had one other question. She was getting 25 hours of applied behavioral technique. Was it 25 hours at Fenichel during the preceding year? Under the settlement agreement. Or would she have gotten it? The school board offered her at least 10 in the school as part of the school program. How much would she have had at the Fenichel school? Well, the parents were requesting at hearing that she get district funding for an in-home program, which they felt she continued to need. However, they also had some insurance funding for that and some regional center funding. So their primary concern from the school district was getting support in the Hanna Fenichel program, which was moving from six hours a week to 17.5 hours a week. No, but my point was could some of the progress that she made in the Fenichel school be attributed to the significant number of hours of applied behavioral technique, and that wasn't really part of the Fenichel program. It's hard to believe that 25 hours a week is practically the whole program. I would assume that what she was getting and making progress under the applied behavioral technique was being really financed by her parents and supplemented whatever she was getting at the Fenichel school. Well, the way that applied behavior analysis, early intervention for autism works and the successful research, which was described at hearing by experts, is that children begin typically with one-to-one work at home to get their attention, to get them imitating language, to get them starting to talk. And then when they're ready for peer interactions, they interact with typical peers, usually starting with play dates and then moving into preschool settings with non-disabled peers who are going to provide good models, who are going to respond if they initiate socially, and it does encourage that. So the same people were providing her home program as were providing her aid support at the Hannah Fenichel program. It was applied behavior analysis, partly one-to-one at home and partly there. And, yes, Your Honor, we certainly didn't think that K.A. was ready for a 17.5-hour school-based program and that she could have learned simply through full inclusion and inclusion support during the previous year. The one-to-one services were an important part of her progress, and they had put her at a point where she was very much ready to. My question was simple. Could all of the progress that she'd been making at the Fenichel School be attributed to the Fenichel School as opposed to the 25 hours of applied behavioral analysis or technique that she was getting apparently through services that were provided by the parents? Not that they did it personally, although some parents actually learn how to use the technique and because of the expense they do it themselves. And these do. Yes, certainly. Well, I don't think all of the progress could have come from ABA without Fenichel because much of the progress that was seen was increasing social interaction. She had a sister, but she didn't have an opportunity to interact a great deal with other children outside of school. That was why Dr. Schreibman had suggested that she stay at Hanna-Fenichel because she saw great growth there and thought that she should be allowed to continue. Did he say, or am I just recollecting something that's not in the record, that an ideal solution might have been the four hours of special ed at the public school and the remaining time at the Fenichel School? Yes, she did say that, Your Honor. And one of our concerns was that she did not come to the second IEP meeting. She came to the first meeting and discussed her concerns about the class size at CDC and her belief that that would not, at any time during the year, be an appropriate mainstreaming environment for KA. At first the district was planning to do an offer of a placement in writing. Then they decided to have an IEP meeting. She did not come to the IEP meeting, and a plan was developed, which for mainstreaming is precisely the program that she had thought was inappropriate and then did that in the context of this three-part program that would give KA even more children and more transitions. What about the rest of what the district offered? What was it? One-to-one applied behavioral technique therapy, two hours a day, five days a week, which is ten hours, two 45-minute sessions of language and speech therapy, one 60-minute occupational therapy consultant, in addition to the one-on-one aid when she was in the general ed component. It struck me that that was an effort by the school district to really deal with her problems as they viewed it. Well, it was a lot of hours. The problem is that the program would be aggravating her problems, according to the testimony of everyone who knew her. She had required a great deal of help to adjust to going to church services and from one place to another there. She was still frequently crying coming to and from speech therapy with the school district speech therapist, which she had been doing for several months. She had adjusted very nicely to an age-appropriate preschool program at Hannah Fenichel, but for things that involved more transitions than that or that were more fluctuating than that, she continued to have difficulty. She didn't attend any of the programs. Did she attend part of the year in the year at issue here? Did she attend the public school? No, during her year of being three, she came to the public school for speech and language therapy. Okay. We've taken you over. Okay. Thank you. Mr. Sleeth, would you like a couple of minutes to respond? Well, I wanted to respond once again to the issue of cost. The first question was whether this was really about attorney's fees. The answer is no. And wasn't the issue of cost what drove this decision? And the answer is no. The district really thought that it was providing the best possible program to meet this student's unique needs and that some time away from that regular education environment was necessary in order to attack those particular problems that she was witnessing. And I think that it's Schaefer v. Weiss that says there's an assumption that we're going to give some deference to the school district's experts. I don't know what an assumption is. I would love it if it was a presumption. I would know exactly what to do with it. I would love to treat it as a presumption because they didn't make it. If the Supreme Court was intending to tell us that there's a presumption in favor of these school district experts, then they didn't make it. And the hearing officer didn't adequately assess both Dr. Schreiberman and school psychologist Loveman in their testimony that she really did need this special education component. So she ended up being at Hanna-Fanishel, which is a wonderful school but didn't provide any special education services, with a one-on-one aid with the applied behavioral techniques being applied there. And she didn't get that direct attack. Applied behavioral techniques is a special service that's specifically designed to deal with autistic children and to teach them not necessarily academic subjects. I mean, talking about education in the context of a three-year-old or a four-year-old preparing for kindergarten, they're not going to be learning American history. Basically, in this context, we're talking about dealing with the child's inappropriate behaviors and in helping them to adjust ultimately to hopefully a mainstream environment. Yes. But I don't believe that you can deal with the particular problems of autism symptoms only with that one-on-one aid using those techniques. Your own district is giving her ten hours of applied behavioral techniques, two hours, five days a week. That's a significant amount. They must believe that it's necessary. It's necessary. It is necessary, and it's helpful, and it produced progress. But she needed more, and the district's position is she needed more in that special day class, which is not just a littler classroom. It is specialized techniques driving directly toward the particular problem that the student was exhibiting that the school experts identified, and that assumption in favor of those school experts has been lost in here, I think. Okay. Thank you. Thank both sides for nice arguments. KD versus Solano Beach School District submitted for decision, and that concludes our argument for today. Thank you. All rise for the decision to adjourn.
judges: Korman, Farris, Fletcher